**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| INTELLECTUAL VENTURES II LLC, § <br> § <br> *Plaintiff*, § <br> § <br> v. § <br> § <br> SPRINT SPECTRUM, L.P., ET AL. § <br> § <br> *Defendants*. § <br> § | | Case No. 2:17-CV-0662-JRG-RSP <br> (LEAD) |
| T-MOBILE USA, INC., ET AL., § <br> § <br> *Defendants*, § <br> § <br> v. § <br> § <br> NOKIA OF AMERICA CORPORATION, § <br> § <br> *Intervenor*. § | | Case No. 2:17-CV-0661-JRG-RSP <br> (MEMBER) |

## **MEMORANDUM ORDER**

In this patent case, Defendants move to exclude expert opinions of Walter Bratic, Plaintiff's damages expert (Dkt. No. 298).[1] Bratic opines that Plaintiff is entitled to reasonable royalty damages up to the expected date of trial for the alleged infringement of Plaintiff's U.S. Patent Nos. 8,682,357; 8,897,828; 9,320,018; 9,532,330; 9,681,466; and 8,953,641. (Dkt. No. 298-2); (Dkt. No. 298-3). Defendants contend that Bratic's damages opinions are unreliable and not of assistance to the trier of fact, and thus should be excluded under Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). (Dkt.

---

[1] Plaintiff filed a response, (Dkt. No. 336), Defendants filed their reply, (Dkt. No. 360), and Plaintiff filed its sur-reply, (Dkt. No. 401).

No. 298). Having considered the parties' briefings, the parties' arguments raised at the April 23, 2019 pretrial hearing, and the relevant authorities, the Court rules as follows.

## I. LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Thus, the first inquiry under Rule 702 is determining whether the proffered witness is actually 'qualified to testify by virtue of his "knowledge, skill, experience, training, or education. A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.' *St. Martin v. Mobil Expl. & Producing U.S. Inc.*, 224 F.3d 402, 412 (5th Cir. 2000) (quoting Fed. R. Evid. 702).

Under Rule 702 and *Daubert*, "'a district court has broad discretion to determine whether a body of evidence relied upon by an expert is sufficient to support that expert's opinion.'" *Johnson v. Arkema*, 685 F.3d 452, 458-59 (5th Cir. 2012) (quoting *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354 (5th Cir. 2007)). The court must act as a gatekeeper, ensuring that admitted evidence is reliable and relevant. *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at 592-93, 597, 113 S. Ct. at 2796, 2799). Accordingly, the Court's gatekeeping

function involves a two-part inquiry into reliability and relevance. *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 661 (E.D. La.), *appeal dismissed* (5th Cir. Oct. 27, 2016).

As to the reliability inquiry, the proponent of the expert's opinion testimony need not prove that the expert's testimony is *correct* – the proponent need only prove by a preponderance of the evidence that the testimony is *reliable*. *Johnson*, 685 F.3d at 459 (emphasis added); *see also i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) *aff'd*, 564 U.S. 91, 131 S. Ct. 2238, 180 L. Ed. 2d 131 (2011) ("*Daubert* and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness."). The expert opinion must be grounded in the methods and procedures of science – the opinion must go beyond unsupported speculation or subjective belief. *Daubert*, 509 U.S. at 590, 113 S. Ct. 2786. The court's "focus, of course, must be solely on principles and methodology, *not* on the conclusions that they generate." *Id.* at 595, 113 S. Ct. 2786 (emphasis added).

In determining if expert testimony is reliable, courts consider the following flexible, non-exhaustive list of factors:

> (1) whether the theory or technique has been tested;
> (2) whether the theory or technique has been subjected to peer review and publication;
> (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and
> (4) whether the theory or method has been generally accepted by the scientific community.

*Johnson*, 685 F.3d at 459 (citing *Curtis*, 174 F.3d at 668-69 (citing *Daubert*, 509 U.S. at 593-94, 1113 S. Ct. 2786)). Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or

> data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

Pursuant to these rules, "a district court may exclude evidence that is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1295 (Fed. Cir. 2015).

## II. DISCUSSION

Defendants' largely question whether the licenses Bratic relies on in performing his damages analyses are sufficiently comparable to form a basis for his reasonable royalty analysis. In a related vein, Defendants also take issue with Bratic's opinions concerning pre-suit damages for the '357, '330, '018, and '466 patents. In examining both of these arguments, the Court does not find that Bratic's license methodology or pre-suit damages analysis warrant exclusion under the Federal Rules of Evidence or *Daubert* jurisprudence.

### A. Bratic's License Analysis is a Matter for Cross-Examination

Defendants take issue with Bratic's analysis of the Ericsson, AT&T, and Huawei licenses. Defendants previously challenged Bratic's methodology in related litigation between the parties. *See Intellectual Ventures I LLC v. T-Mobile USA, Inc. et al*, Case No. 2:17-cv-00577-JRG, (the "577 case"), Dkt. No. 224. For the reasons below, the Court reaches the same conclusion as Chief Judge Gilstrap in the 577 case and finds that Bratic's license analysis is sufficiently reliable.

### i. Ericsson Licenses

Defendants contend that Bratic's analysis of the Ericsson licenses is unreliable because he does not account for the technological and economic differences between the hypothetical and actual licenses and fails to apportion the value of the patented invention. Defendants also contend that because Dr. Douglas Chrissan's technical valuations should be excluded as unreliable, Bratic's opinions that rely on Dr. Chrissan's valuations should be excluded as well. However, as the Court noted in the Memorandum Order regarding Dr. Chrissan (Dkt. No. 437), Dr. Chrissan's opinions will not be excluded and, thus, Bratic's opinions relying on Dr. Chrissan's technical analysis will not be excluded. Accordingly, the Court considers Defendants' contentions with that understanding.

#### 1. The Technological and Economic Differences Between the Hypothetical and Actual Licenses

Defendants argue that Bratic "fails to account for the technological differences between the 19 Ericsson licenses upon which he relies and the hypothetical licenses between [Plaintiff] and Defendants." (Dkt. No. 298), 13. Defendants contend that the Ericsson licenses involve royalties for third-party handset sales, whereas the hypothetical license involves functionality in the base stations and the baseband processor in the handsets. *Id.* Plaintiff responds that the Ericsson licenses state they are directed to Ericsson's 4G LTE patent portfolio, and the Ericsson-ZTE "Proud List"[2] is the best evidence of the technology covered by Ericsson's LTE licenses. (Dkt. No. 336), 9. The patents in the Proud List, Plaintiff contends, are analyzed by Dr. Chrissan, on whom Bratic relies. *Id.* Plaintiff points out that Defendants' argument about Ericsson licenses involving royalties for third-party handset sales is "factually incorrect," *id.* at 10-11 (citing Dec. 12, 2018 Bratic Rep.,

---

[2] "Proud Lists" are "representative lists of patents that each company believes are particularly applicable to its negotiating partner's business and products." *Tex. Instruments, Inc. v. Hyundai Elecs. Indus. Co.*, 42 F. Supp. 2d 660, 664 (E.D. Tex. 1999).

(Dkt. No. 336-1), ¶¶ 312-39, 348-57, Exs. 5 & 5.1), and that a "damages expert has no obligation to account for every conceivable difference," (Dkt. No. 336), 11.

Defendants further contend that Bratic fails to account for the economic differences between the 19 Ericsson licenses and the hypothetical licenses between Plaintiff and Defendants. (Dkt. No. 298), 13. Defendants contend that comparing one group of patents that is representative of thousands of patents to the six patents-in-suit ignores the value of the vast majority of patents in the portfolio. (Dkt. No. 360), 3. Plaintiff responds that Bratic does not ignore this difference, but notes that the representative Ericsson-ZTE Proud List was the basis upon which ZTE agreed to pay royalties to Ericsson. (Dkt. No. 401), 3. Thus, according to Plaintiff, Bratic's methodology is consistent with Evelyn Chen's deposition testimony noting that the 18 U.S. Patents in the Proud List showed Ericsson's breadth of patent holding in the particular ZTE matter. *Id.*

Defendants fail to show how Bratic's Ericsson licenses analysis is actually unreliable. As Plaintiff recognized, "Testimony relying on licenses must account for such distinguishing facts when invoking them to value the patented invention. Recognizing that constraint, however, the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014). Here, it appears that Bratic accounts for both the technological and economic differences between the hypothetical and actual licenses. Now, "whether these licenses are sufficiently comparable such that [Bratic's] calculation is a reasonable royalty goes to the weight of the evidence, not its admissibility." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014). Further, the remainder of Defendants' arguments concerning Bratic's comparison between the parties' hypothetical licenses and the Ericsson licenses are without merit. Bratic's opinions are admissible on this ground.

## 2. The Value Attributable to the Patents-in-Suit

Defendants argue that Bratic fails to apportion damages to account for (1) FRAND encumbrances and the value of the LTE standards to which five of patents-in-suit are essential; (2) the smallest salable patent-practicing unit ("SSPPU"); and (3) the value of the patented features. (Dkt. No. 298), 1.

### a. The Five Allegedly Standard-Essential Patents-in-Suit

Defendants contend that Bratic "must also apportion for" the already increased value of five allegedly standard-essential patents-in-suit – '357, '018, '330, '466 and '828 patents (sometimes referred to as the "IPWireless Asserted Patents"). *See* (Dkt. No. 360), 1. n. 2. At the April 23, 2019 hearing, the Defendants argued that Bratic needed to reduce the value of the '357, '018, '330, and '466 patents, just as he did for the '828 patent. Defendants argued that Bratic had no reliable basis for failing to reduce the four patents other than relying on Dr. Chrissan's argument that the IPWireless Asserted Patents had "inherent value" aside from 3GPP standards. Plaintiff responds that not all of the Defendants actually agree that any patent-in-suit is actually standard-essential but, even if any patent-in-suit were standard-essential, Bratic adequately addressed that fact. (Dkt. No. 336), 15 (citing Dec. 12, 2018 Bratic Rep., (Dkt. No. 336-1), ¶ 211). At the April 23, 2019 hearing, Plaintiff argued that Bratic had to rely on Dr. Chrissan to know whether the intrinsic value of the technology that is claimed in the invention is in fact driving the value of the patented feature. Plaintiff contended that for the '357, '018, '330, and '466 patents, Dr. Chrissan found that the intrinsic value of that invention is where the value lays, it does not lie in the fact that it has been standardized, but for the '828 there needs to be a discount because it was standardized. Bratic then used the discount to do the apportionment, according to Plaintiff, which

is consistent with the Federal Circuit's guidance in *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295 (Fed. Cir. 2015) and *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201 (Fed. Cir. 2014).

The Court does not find Defendants' contentions to be persuasive. The Federal Circuit in *CSIRO* reaffirmed "that reasonable royalties for [standard-essential patents] generally– and not only those subject to a RAND commitment – must not include any value flowing to the patent from the standard's adoption." 809 F.3d at 1305. In analyzing the factors expressed in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y.1970), it is improper to increase the royalty award simply because the patent is standard-essential. *See CSIRO*, 809 F.3d at 1305. Here, Bratic is providing an analysis of the IPWireless Asserted Patents that accounts for any value flowing to those patents from the 3GPP standard's adoption. Defendants essentially contend that Bratic must demonstrate that he did not violate Federal Circuit precedent concerning the '357, '018, '330, and '466 patents. *CSIRO* does not require a reasonable royalty analysis to set out how it is *not* violating *CSIRO*, but simply requires that the analysis refrain from such violation. Defendants make no showing that Bratic's analysis includes value flowing to all of the IPWireless Asserted Patents from the standard's adoption. Without such an indication, the Court will not exclude Bratic's opinion on that basis.

### b. The Smallest Salable Patent-Practicing Unit

Defendants contend that Bratic failed to consider using either the baseband processor or the application specific integrated circuits in the eNodeB as the SSPPU, even though Plaintiff's infringement contentions map the patents-in-suit's claims to the application specific integrated circuits used to process radio communications. (Dkt. No. 298), 9. Plaintiff responds that Defendants' position contradicts Defendant Ericsson's earlier view in litigation involving its ETSI-declared patents, where Ericsson moved the Court "to determine whether the FRAND

Commitment requires a royalty to be based on the SSPPU." (Dkt. No. 336), 15 (quoting *HTC Corp. v. Telefonaktiebolaget LM Ericsson*, No. 6:18-cv-00243-JRG, 2019 WL 126980, at *3 (E.D. Tex. Jan. 7, 2019)). Plaintiff argues that this Court should apply the result from that case. *See* (Dkt. No. 336), 16. Defendants reply that *HTC* does not apply, and that controlling Federal Circuit authority requires a reasonable royalty to be calculated based on the SSPPU. (Dkt. No. 360), 2. Plaintiff responds by pointing out that the Federal Circuit has held that "otherwise comparable licenses are not inadmissible solely because they express the royalty rate as a percentage of total revenues, rather than in terms of the [SSPPU]." (Dkt. No. 401), 2 (citing *CSIRO*, 809 F.3d at 1303). Plaintiff further agues that the Ericsson licenses do not set royalties by reference to any sort of SSPPU. (Dkt. No. 401), 2.

The SSPPU principle "states that a damages model cannot reliably apportion from a royalty base without that base being the smallest salable patent-practicing unit" *CSIRO*, 809 F.3d at 1302. However, and as pointed out by Plaintiff's counsel at the April 23, 2019 hearing, not all damages models must begin with the SSPPU, as requiring every damages model to do so "conflicts with [the Federal Circuit's] prior approval of a methodology that values the asserted patent based on comparable licenses." *Id.* at 1303. "Such a model begins with rates from comparable licenses and then 'account[s] for differences in the technologies and economic circumstances of the contracting parties.'" *Id.* (quoting *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010)). "Where the licenses employed are sufficiently comparable, this method is typically reliable because the parties are constrained by the market's actual valuation of the patent." *CSIRO*, 809 F.3d at 1303. With this caselaw in mind, the Court finds Defendants' arguments unpersuasive and contrary to Federal Circuit precedent. Plaintiff is correct in noting that Bratic is not required to

begin with a SSPPU[3] when his damages model is based on comparable licenses. Therefore, given that the Court finds that the Ericsson licenses are comparable, the Court will not exclude Bratic's opinion on this ground.

### c. The Value of the Patented Features

Defendants contend that Bratic does not apportion the purported value of the patented features from the unpatented features of the accused products. (Dkt. No. 298), 10. Defendants argue that Bratic derives a 5.0 cent per-subscriber per-month rate as a royalty without apportioning, and such analysis is improper given that the accused products include non-infringing features. *See id.* at 10-11. Plaintiff responds that Bratic's damages methodologies depend on comparable licenses, and because Dr. Chrissan expressly compared the value of the Ericsson-ZTE Proud List to the patents-in-suit, "any required apportionment is effectively subsumed by Dr. Chrissan's evaluation of the relative contributions of the respective patents." (Dkt. No. 336), 16. Defendants contend that Plaintiff's responsive argument fails because the Ericsson licenses have a different base (handsets) from the one that Bratic uses (wireless carrier subscriber months). (Dkt. No. 360), 2.

Defendants' arguments do not undermine Bratic's methodology. As the Court alluded at the April 23, 2019 hearing in discussing Defendants' thirteenth motion *in limine*, Bratic can rely on the per-subscriber per-month basis used in the industry, particularly since there has been no showing that Bratic's analysis does not apportion non-infringing features. Accordingly,

---

[3] Further, Defendants' arguments as to the entire market value rule are unpersuasive. The entire market value rule is a narrow exception to the general SSPPU rule. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("Thus, it is generally required that royalties be based not on the entire product, but instead on the "smallest salable patent-practicing unit." …The entire market value rule is a narrow exception to this general rule. If it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product."). Given that Bratic does not begin with the SSPU, the entire market value rule is inapplicable.

Defendants' arguments are fodder for cross-examination. The Court will not exclude Bratic's opinion on this ground.

### ii. AT&T and Huawei Licenses

Defendants take issue with Bratic's AT&T and Huawei licenses analysis, arguing, *inter alia*, that Bratic's license fee calculation based on the AT&T settlement and Huawei release should be excluded as non-comparable, despite the contrary testimony that Bratic relied on in his expert report.

Defendants argue that Bratic's license fee calculation based on the AT&T settlement should be excluded because that settlement involved a portfolio license to thousands of Plaintiff's patents and settled eight lawsuits covering 46 patents. (Dkt. No. 298), 15. Defendants also argue that Bratic allocates a majority of the value of this settlement agreement to the LTE II litigation because of impending infringement lawsuits, but "there is no evidence that AT&T paid millions of dollars based on patents that [Plaintiff] never asserted or even mentioned to AT&T." *Id.* at 16. Plaintiff opposes this argument on the grounds that Bratic expressly relies on the understanding of John Paschke, Plaintiff's Rule 30(b)(6) witness, that the motivating factor for the AT&T settlement was Plaintiff's patents asserted in DSL-related litigation against AT&T. (Dkt. No. 336), 19.

At the April 23, 2019 hearing, Defendants argued that there is no evidence, other than the *ipse dixit* explanation of Plaintiff, that these licenses were negotiated on the basis of the patents-in-suits as opposed to the thousands of other patents in Plaintiff's portfolio. Defendants contended that they tried to obtain the information that would show that other patents drove the negotiation, but were prevented from doing so. Defendants argued that they asked Paschke at his deposition about the term sheet signed by AT&T (which was allegedly before the instant suit was filed), and whether there was an enforcement mechanism for the term sheet. Defendants argued that this term

sheet would refute the idea that AT&T decided to stick with the dollar amount in the term sheet because of the parties' litigation, including the present case.

In response, Plaintiff's counsel re-iterated arguments raised in the underlying briefing – Paschke only testified about his views of the AT&T negotiations and did not talk to Bratic about any privileged communications between AT&T and IV during the negotiations. Thus, according to Plaintiff, Bratic did not rely on any privileged communications nor is Paschke's understanding grounded by matters based on and reflective of privileged communications. Importantly, Plaintiff's counsel provided the context of this dispute. Plaintiff's counsel explained that in early December, after Pashcke's deposition and after Bratic disclosed his reliance on the AT&T licenses in an earlier case, there were a number of communications between the parties about Plaintiff's invocation of the mediation privilege. Plaintiff's counsel stated that they explained that the term sheet was part of the mediation conducted by the parties and thus invoked the privilege.

While the Court does not find Defendants' contentions regarding Bratic's methodology to be persuasive, the Court finds Paschke's testimony deserving of further analysis, in that his understanding regarding the motivation for the AT&T negotiations appears to be based on information that has been shielded from Defendants thus far. The question remains whether Paschke, and consequently Bratic, should be barred from testifying about Paschke's inside knowledge of the AT&T negotiations in that vein at trial.

Defendants also argue that Bratic's opinion regarding the royalty rate based on the Huawei release should be excluded because the Huawei agreement also involves a license for thousands of patents, the vast majority of which Bratic does not assign value. (Dkt. No. 298), 15-16. Defendants further contend that Bratic does not analyze the relative value of the licenses at issue in the Huawei release and the patents-in-suit. *Id.* at 16-17. Plaintiff responds that Defendants "argue the facts,"

as Bratic derives a per-unit payment allocating the release payment to the patents-in-suit in light of the fact that Plaintiff and Huawei's negotiations were focused on Huawei's past LTE device sales in the U.S. and the instant cases. (Dkt. No. 336), 19.

As Plaintiff correctly notes, Defendants' contentions as to Bratic's Huawei licenses methodology are more about "the facts" than pointing out how Bratic's Huawei licenses methodology is actually unreliable. Any such arguments should be reserved for cross-examination at trial. *Daubert*, 509 U.S. at 596, 113 S. Ct. 2786. Accordingly, Bratic's opinions concerning the Huawei licenses will not be excluded on this ground. The Court discusses the potential effects of Paschke's testimony for Bratic's analysis of the AT&T licenses below.

### B. Bratic's Opinions Concerning Pre-Suit Damages are Admissible

Bratic opines that Plaintiff is entitled to pre-suit damages for the '357, '330, '018, and '466 patents. Defendants contend that this opinion is contrary to law because, (1) as set forth in their summary judgment motion on pre-suit damages, Plaintiff failed to comply with 25 U.S.C. § 287, and (2) Bratic calculated damages before the '330 and '466 patents were issued. (Dkt. No. 298), 20. Plaintiff "incorporates" its response to Defendants' summary judgment motion as to Defendants' first contention. As to Defendants' second contention, Plaintiff responds that Bratic "specifically noted that a hypothetical licensee would have been willing to pay a single combined royalty rate for the related '357 and '330 patents and for the related '018 and '466 patents. (Dkt. No. 336), 16 (citing Dec. 12, 2018 Bratic Rep., (Dkt. No. 336-1), ¶¶ 352-53).

As to Defendants' first contention, the Court has issued a Report & Recommendation on Defendants' summary judgment motion (Dkt. No. 456), and thus this contention will not be taken up here. As to Defendants' second contention, Bratic's reasonable royalties analysis does not appear to award royalties pre-suit, but simply discusses what the parties would have agreed upon

at the hypothetical negotiation as to the '357, '330, '018, and '466 patents. Whether this theory is flawed goes to the weight of the evidence, not to its admissibility. *See Summit 6*, 802 F.3d at 1299. Accordingly, this dispute is for the jury.

## III. CONCLUSION

The Court will not exclude Bratic's damages opinions. Defendants have the opportunity to conduct vigorous cross-examination of Bratic, present contrary evidence, and seek careful instruction on the burden of proof at trial – these are the traditional and appropriate means of attacking admissible evidence. *Daubert*, 509 U.S. at 596, 113 S. Ct. 2786. Accordingly, Defendants' *Daubert* motion to exclude Bratic is **DENIED**.

Counsel for Defendants and Plaintiff are directed to file, by Monday, April 29, 2019, a supplemental brief addressing the admissibility of Paschke's testimony about the motivation underlying the AT&T licenses. Counsel should be prepared to discuss the supplemental briefing at the May 3, 2019 pretrial conference.

**SIGNED this 26th day of April, 2019.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE